UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
UNITED STATES OF AMERICA                      <u>SENTENCING MEMORANDUM</u>

    -against-                                              20CR-00079 (RMB)


LEO HERNANDEZ,

                    Defendant
---------------------------------------------------X


**SENTENCING MEMORANDUM OF DEFENDANT LEO HERNANDEZ**




RESPECTFULLY SUBMITTED,


Cohen Forman Barone, LLP
BY: David J. Cohen
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com
212-766-9111

1

## INTRODUCTION

Leo Hernandez comes before the Court for his October 18, 2022 Sentencing Hearing after having previously pled guilty, on April 28, 2022, to the first count of the indictment against him in violation of 21 U.S.C. § 841(b)(1)(C). A repentant, hard-working, and self-aware man with a very limited criminal history, save his instant offending, Mr. Hernandez respectfully seeks this Court's justice and mercy in conducting its analysis of the appropriate sentence to be imposed upon him for his criminal actions.

## I.      18 U.S.C. §3553(A) FACTORS

*18 U.S.C. § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

### The Nature and Circumstances of the Offense

Leo Hernandez (herein after referred to alternatively as: "Mr. Hernandez", "Leo", or "Defendant") was charged with and has pled guilty to acting contrary to 21 U.S.C. § 841(b)(1)(C) in violating of 21 U.S.C. § 846. Specifically, Mr. Hernandez pled guilty to knowingly and intentionally conspiring with others, including Dr. Joseph Olivieri, Anastasuios Verterouris, Matthew Brady[1], and others, to distribute and possess with the intent to distribute, quantities of oxycodone, oxymorphone, morphine sulfates, and amphetamines, each a Schedule II controlled substance.

The offense conduct is, no doubt, very serious and entails the defendant having contributed to the spread of dangerous, habit-forming, opioid drugs in this country. The serious nature of this offense certainly warrants serious consequences for the offender, and the defendant, Mr.

---

[1] See, 18-CR-316 (PAC).

Hernandez, incarcerated for the last 17+ months, understands and acknowledges this reality completely and accepts responsibility for his role.

**_History and Characteristics of Leo Hernandez_**

Mr. Hernandez is one of (3) children born to Nilda Hernandez (nee Rodriguez) and Eleodoro Hernandez. Leo, who has turned 40 and 41 years of age while detained, is the youngest of three brothers. Leo's eldest brother, Isaac Hernandez, is thirteen (13) years his senior and is employed as a fraud investigator with the New York City Human Resources Administration for more than seven (7) years[2] and currently resides with Leo's mother at the family's home located at 49 Mackay Place in Brooklyn's Bay Ridge neighborhood. Leo resided at that same address throughout his childhood and then intermittently during adulthood. Also, presently residing with his eldest brother and mother, is Leo's other brother, Michael Hernandez, who suffers from both bipolar disorder and paranoid schizophrenia. See generally, PSR at ¶ 41. Leo has not had significant contact with his father since his father abandoned the family when Leo was a small child[3], however, Leo would go on to develop very strong bonds with his mother's family. This was especially true of his maternal grandparents and uncles. Leo's maternal uncles tried best they could to step in and set strong examples of hard-working and responsible men for Leo to model himself after.  See Exh. A, _Affidavits and Statements of: Miriam Rodriguez, Lucas Rodriguez, Nilda Hernandez, and Isaac Hernandez_; see also generally, PSR ¶ 40-42.

Growing up in Bay Ridge, Brooklyn, Leo lived with his mother (who never remarried after Leo's father left) and brother, Michael. His other brother, Isaac, had gone to live across the world in Asia as a young man. They lived in modest but safe conditions and Nilda worked extremely

---

[2] See, Exh. A, _Statement & Employment Verification Letter of Isaac Hernandez._
[3] See, Exh. A, Statement of Lucas Rodriguez ((Defendant's maternal uncle).

long hours to support herself and the boys.  She was the de facto landlord and porter of their building.  Sweeping and mopping floors and taking out the trash for more than four decades. As a result of his mother's work hours, young Leo spent a significant amount of time in the home of his grandparents who lived just blocks away and with whom he grew extremely close. Leo also spent a great deal of time being cared for by his uncle Lucas and his  uncle Isaac (a former Riker's Island Corrections of Officer for over 30 years) and Isaac's wife, Miriam Rodriguez (an NYPD Evidence & Property Control Specialist for over 30 years). See, Exh. A, *Affidavit of Miriam Rodriguez (with evidence of her service to the NYPD and her deceased husband's (Leo's uncle Isaac) service to the NYC Department of Corrections).*  The loss of both of his grandparents years ago, still leaves deep wounds for Leo.  And, the unexpected death, just this spring of his beloved uncle Isaac has been very sobering. Id; see also *Statement of Isaac Hernandez*. Isaac's passing was particularly grueling for Leo given his incarceration and inability to say any form of good bye to a man who, while not Leo's biological father, certainly earned the right to be called dad.

Leo was an outgoing and respectful young man who earned a good reputation in his community. Being raised in a deeply religious family with several members having dedicated their lives to public service, Leo grew up in the church and also through the Boy Scouts.  The Boy Scouts helped teach early on the value of earning one's own place and gaining advancement in an organization through hard work, altruism, and community service. See generally, Exh. A, *Affidavits & Statements of Family Members and Friends in the Community*. While he learned and internalized the values instilled in him by his mother's family and the community he grew up in, Leo was nevertheless deeply affected throughout his childhood and adolescence by the departure and near total absence of his father. As he advanced in his schooling, he found himself increasingly distracted and unable to focus, while at the same time irrationally worried and nervous albeit

unable to determine the source of such feelings[4]. Ultimately, by the time he reached high school, Leo found himself struggling mightily with his studies. Paying attention in school was very difficult and with the constant anxiety produced by neurological issues, school became nearly impossible for young Leo Hernandez. Despite not being a "good" student, Leo was a respectful teenager, dependable and clearly hard working.   By high school he began receiving several opportunities for employment.  His schooling difficulties aside, he was viewed as a potential great employee by the older working class craftsmen around his neighborhood.  The ability to earn money and help his mother and mentally ill brother, Michael, seemed like a command.  In his teenage mind, school v. helping my family, the choice was clear.  He dropped out of Fort Hamilton High School[5] before completing his freshman year and began to work for his mother's boyfriend in the roofing business.

Around the time Leo stopped going to school (15 years old) and began working for a living, he also became exposed to drugs and alcohol, noting that he began drinking, using marijuana and recreational drugs during his teenage years. See generally, *PSR at ¶ 48*. Ultimately, Leo's recreational drug use during those early years led to poor decision-making and an arrest at age 20 for controlled substance offenses. *PSR at 34*. Mr. Hernandez attended and completed a long-term drug treatment program[6] that enabled him to see the self-destructive road he had been going down.

---

[4] Years later Leo would be diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) as well as anxiety disorder for which he has been on a course of regular medication, including Adderall and Xanax throughout his life. See, *PSR at ¶ 47*. Notably, as discussed, *infra*, since his arrest and detention in April of 2021, Leo has been denied in his numerous requests to meet with a psychiatrist (save two meetings at the very beginning of time inside) in order to be prescribed medication to treat these conditions. He has been managing both his ADHD and his significant anxiety as best he can on his own with no other option available. The mental strain, the stress of incarceration, lockdowns and no human contact during this grievous time has taken a significant toll on Mr. Hernandez, especially without his medications readily available.

[5] Fortunately, years later Leo recognized the limitation of being a high school dropout with no diploma and he went back and earned his Graduate Equivalency Degree (GED).

[6] *PSR at 49*.

The stint in the drug program which Leo attacked with zest and completed,  was evidence of good decision making as he chose to pursue to pursue a different path- one of hard work, saving his earnings, and devotion to God and family. He was able to stay on that path for many years before a combination of circumstances as well as his own poor-decision making led him back into a world of substance abuse and soon enough his criminal offending conduct in this case.

Leo became extremely proficient in the roofing trade and worked long hours in that field for several years during his teens and early 20's. [7]  He was making and saving money while helping his single mother out as well with expenses.  In the early 2000's, Leo saw an opportunity in the field of commercial truck driving.  He earned his Commercial Driver's License (CDL) and was hired by a Queens-based cement company, Ferrera Brothers Building Material Corporation, as a driver.  He learned and excelled in this role  holding a position there for thirteen years. See, Exh. B, *Letter from Prior Employer, Brian Ferrera*. That employment allowed Leo the opportunity to buy a home and plan his future.   Leo's former employer describes Leo as a dedicated, dependable employee during the many years (2005-2018) that he maintained his position with the family business. A quick learner whose personality fit the high-pressure nature of job, his former manager lauds his patience and notes how Leo's infectious personality left a lasting and positive impression on all of those he worked with and for. *Id*.

Although he had found and maintained good employment by his mid 20's, Leo found himself continuing to struggle in his daily activities with both his ability to focus and to ward off generally distressed and anxious thinking. The struggles of anxiety, ADHD distraction and stress are so difficult to live with because of stigma associated with them and the fact that there is little if any physical manifestation of the disease.  Having learned to seek out professional help rather

---

[7] See, *PSR at 50*.

than to self-medicate (in the outpatient program he completed in 2003), Leo was determined to address his difficulties.  In 2005, he began  seeing a psychiatrist and was diagnosed, as noted *supra*, with both anxiety disorder and ADHD.  Leo was appropriately prescribed  medications for both of these ailments. He also continued pursuing his passion in fitness and bodybuilding[8] that began in his early adulthood and continues to this day.  He continued his excellent work for Ferrera Brothers, which ultimately enabled him through years of saving, to purchase a home in Staten Island in 2010[9].  Leo was firmly on the right path in his life as a hard-working self-made home owner (before he had reached even 30 years of age), who was managing his anxiety and ADHD with difficulty, albeit, successfully.

Unfortunately, the upward trajectory he was on in life was interrupted in the years that followed as his body began to breakdown as result of his hard labor, intense exercise regimen and a handful of physical ailments in including lifelong asthma[10]. Leo incurred a herniated disc and experienced intermittent back pain as result of his weight-lifting; and, his doctor (Joseph Olivieri, who was already Leo's physician prior to the present conspiracy) began prescribing him oxycodone to manage the pain. While he initially only took the medication when his pain was particularly intense or debilitating, over time, Leo found himself becoming increasingly reliant upon the medication. As he became more and more reliant, his interactions with Olivieri became more frequent. The doctor was always willing to provide as much medication that Leo (already addicted?) would request.  It was Leo Hernandez' physical problems that were the basis for his initial exposure to the opioids.  This exposure turned addiction, became worse in 2015 when Leo

---

[8] It was this interest and then injuries and difficulties he encountered in conjunction therewith that led to him being referred to Joseph Olivieri years before his criminal offending began. Olivieri became Leo's general practitioner, treating for multiple issues including cholesterol, hair loss, as well as testosterone deficiencies related to his body-building goals.

[9] See generally, Exh. D, *2018 Home Sale Documents relating to 38 Avon Place, Staten Island, NY.*

[10] See, Exh. E, *Medical Records.*

incurred a very serious injury, slipping in his home while weightlifting. He broke his ankle in three places and ultimately requiring the placement of a titanium plate and screws to properly set his bones. See, Exh. E, *Medical Record of Defendant.*  Already prescribed oxycodone by Oliveira prior to the injury, Leo's dependence on the drug and his concomitant involvement in the conspiracy only deepened from that point. Leo recalls that his ankle injury truly hastened the worst period of his addiction that led him to obtain more and more pills which he both took to feed his habit and also sold to others.

In and around 2017, with both his addiction and his offending behavior continuing, Leo (in moments of clarity and honest reflection) reports he became increasingly aware that he was not moving in the right direction.  He was unsuccessful in his attempt to simply stop using "cold turkey" or completely divest himself of his activities in the conspiracy as the two were of course, inextricably intertwined. Nevertheless, Leo slowly began tapering down his weekly and then daily usage over a sustained period as he knew this would be the only way for him to fight his way out of the significant addiction problems that he had brought upon himself. While he tapered down his drug use over time, Leo also began formulating a plan for a new direction in his life, which included both a change in career and a complete change in scenery. He had always been enamored with Colombia and had long dreamed of moving down there and opening his own tourism business. Feeling like he was in an inescapable rut- no doubt due to his thoroughgoing guilt and uneasiness with his criminal offending and his addiction problems, Leo fully invested himself in turning what had always been a bit of fanciful dream into a reality. By the end of the calendar year 2017, Leo had made the necessary preparations, cut down his opioid use to zero, and moved for the first time in his life, out of New York City, resettling in Cartagena, Colombia.

Leo was able to sell his Staten Island home in early 2018[11] and he used the proceeds to start an Air B&B business (Royal Cartagena VIP), offering short-term property rentals in Colombia and arranging tour packages, boat rentals, and a VIP concierge service. As with any new business, it took time and investment without much return for a significant period.  Leo was investing every penny he made back into the business.  He would rent a home, make vast improvements at his own expense with the expectation of recouping his investment(s) over several years.  The business model was sound.  Owners of the property enjoyed the "free additions" to their home and renters of the home paid nicely for the use of the premises.  By 2020, the business had earned an excellent reputation and was poised to begin turning a serious profit. See, Exh. C, *Statements of Nick McGirr & Omar Lujan*. Moreover, Leo's opioid addiction and criminal behavior were years in the rearview mirror by early 2020[12] and, although he still struggled (but was treated through medication) with the anxiety and ADHD that afflicted him his whole life, he found himself once again in a good place and excited for what the future held.

Just as it did for so many small businesses in the U.S. and around the world, the COVID-19 pandemic essentially shut down the progress Leo and the business had been making. Nevertheless, Leo drew upon his patient and hard-working nature to lead his team in persevering through the adversity that 2020 and early 2021 presented. As lockdowns came to an end in early 2021, Leo had managed to keep the business afloat, pay his employees throughout the pandemic, and hit the ground running when travel to Colombia resumed. It was at this point, when the business had again begun to prosper, that he was arrested by law enforcement officers in Colombia.

---

[11] See, Exh. D, *2018 Home Sale Documents relating to 38 Avon Place, Staten Island, NY*.
[12] Leo had quit the conspiracy on his own before it had ended and before his codefendants were arrested.

Since being returned to the U.S. in April of 2018[13], save for two months in a Miami prison, Leo has remained detained at the Metropolitan Detention Center in Brooklyn (hereinafter "MDC Brooklyn"). Having been caught completely off guard by the arrest and return to the U.S. (his admitted criminal conducted had concluded years earlier) Leo, who had never been incarcerated before, was completely disoriented and distressed during his first several weeks in jail. He was without his prescribed anxiety medication throughout that time, only receiving single doses of medication on a couple of occasions and generally denied, despite repeated requests, access to a psychiatrist.  Treatment for his disorders immediately became nonexistent. This type of incarceration, being taken off your doctor prescribed psych meds cold turkey, made each day of an already dismissal incarceration existence, significantly more traumatic.  Instead, he was- and has been for nearly the last year and a half- forced to deal with his anxiety on his own, without any manner of medication, in what has been without question the most anxiety-inducing period in his whole life.

To say that it has been a struggle for Leo while incarcerated, particularly in the first several months of his detention and adjustment to captivity, would be a significant understatement. The most unbearable symptom of his anxiety is his sustained inability to sleep throughout the last 18 months. That, coupled with the unwillingness of his jailers to allow him to meet with a psychiatrist to obtain the appropriate pharmacological treatment for it, has made the already nearly inhumane conditions at MDC exponentially worse. For most of his adult life, independent of the years he was abusing oxycodone, Leo has been prescribed Xanax to combat his anxiety and help him sleep. He has also been suffering from sleep apnea since 2013 and requires a CPAP machine at night to

---

[13] He spent several weeks in custody at multiple jails in Colombia then two months at a jail in Florida before being brought to New York.

combat that particular issue. See, Exh. E, *Medical Records from New York Eye and Ear Infirmary, Sleep Center*; see also, *BOP Medical Records*.

The Bureau of Prisons did provide Leo the necessary CPAP machine relatively quickly[14], however, in the first few months of his incarceration his possession of the device greatly imperiled his own safety and future. Leo was housed in a unit at MDC Brooklyn along with a handful of MS-13 gang members and when they became aware of his possession of the electronic device, they immediately began applying coercive pressure to Leo to give them the cord from the machine. The goal was to modify the electric cord so it could function as a power cord for contraband cellular phones. Leo realized that if he capitulated to their demands and was discovered in doing so, he would be charged with a significant violation and that it could have an extremely adverse impact upon his case and his future freedom. The last thing in the world he wanted to do was commit any kind of violation of facility rules and, indeed, as noted by the probation department, *Leo has not incurred a single disciplinary infraction in his nearly 18 months of detention.* PSR at ¶6. (emphasis added) However, as he continued to resist and make up excuses to the gang members pressuring him, their requests and applications of pressure graduated into full-blown threats against his safety and his life on a daily basis.  He was ultimately moved away from that unit, not a moment too soon.

Leo had already been doing everything he could to be assigned to a unit of the facility that would allow him to work and make some productive use of the time he would be incarcerated. Almost immediately upon his arrival at MDC, Leo recognized that the best opportunities to work were in the facility's kitchen and so he focused all his energy on doing everything in his power to earn one of those positions. He wrote letters almost every day to his jailers explaining his

---

[14] Id, *BOP Medical Records*.

employment history and why he would be an exemplary and reliable worker. Day and after day, week after week he wrote letters (he estimates anywhere from 30-50 letters in total) and as the pressure and threats from the MS-13 members in his unit escalated, more impassioned became his pleas. Finally, just when he felt that the danger level had reached a breaking point for him, his request was granted and he was moved from his initial unit to the "kitchen unit", although he was not given an official job or position at that point beyond being dishwasher[15]. Nevertheless, he was able to see, once again, how dogged determination and dedicated focus on achieving a goal were the keys to his success.

Once Leo was allowed into the kitchen unit, the next step for him was earning an actual position working in the kitchen. Leo quickly learned from the veterans in the kitchen unit that the key to get a job was to show the guards that he was serious and had the self-discipline to keep on pushing for it, even if initially rejected. And, Leo did precisely that. He would rise at 6AM (he was barely sleeping as it was due to his anxiety) and take himself down to the kitchen where he would beg the guards for a job in the kitchen. Each day, day after day, he would find one of the guards and explain why he merited such a position. Invariably, he was told there was nothing available and he was wasting his time, but, just as invariably, there Leo would be the very next morning, back in the same place at the same time begging the same officers to give him a chance. This continued for some four (4) months before his resolve to never give up finally paid off and he was reassigned the task of making the food trays for the inmates in the facility's special housing unit (SHU). After doing that work for a few months he was reassigned again to the current position he has now held for several months where he is responsible for loading the lunch and dinner carts for the building. See, PSR at ¶52; see also, Exh. G. This is considered one of, if not, the best position

---

[15] See generally, Exh. G, *Work Performance Rating Forms (BOP)*.

in the prison.  There is a great deal of autonomy and the prison authorities trusted him to stock all the trays for his section of inmates.  The trays were not checked after Leo stocked them with food. A strong testament to the level of trust Leo Hernandez earned with authorities. Leo has not squandered the position he worked so hard to earn, having performed his duties to an exemplary level while continuing to maintain a pristine disciplinary record through his incarceration despite all of challenges and hardships he has had to endure.

While the work performance evaluations from the corrections officers speak for themselves, it would be remiss for defense counsel not include just a couple of particularly insightful observations from his supervisors that best capture Leo's true nature. In his most recent evaluation, his supervising officer spoke of Leo's "exceptional behavior" and he how goes "above and beyond" in the performance of his duties and how his "work ethic and ability to communicate well with other inmates and staff have earned him respect from his peers and staff." See, Exh. G, *(Evaluation Period April 2, 2021 – August 5, 2022).* In a June 25, 2022 report a different officer described Leo as "very efficient and reliable" in moving from dishes to meal preparation for the entire population and how he remains "very hard-working and responsible and always ready to learn." Id, *(Evaluation Period June 25, 2022*).

An important context for Leo's experience in detention over the last year and a half continues to be the extremely difficult conditions at MDC Brooklyn. After being detained at MDC, Leo contracted a serious case of COVID-19 that rendered him sick for weeks; and, he has been infected and sick with the virus two additional times. Fortunately, there are no obvious signs of long COVID. Leo has been seeing prison medical staff who are treating him to help manage his cholesterol issues without the need for medication[16]. Although his physical condition has

---

[16] See, Exh. G, *BOP Medical Records* (selected).

improved, Leo continues to fear for his safety.  What he has witnessed inside the institution (violent acts, including assaults and suicides) he candidly admits has traumatized him.  But even more disturbing than the COVID-19 situation and endemic culture of violence within MDC, have been the lengthy and recurrent lockdowns of the facility.

Leo notes that during the extended lockdown, which lasted from November 26, 2021 through March of 2022, he and other inmates remained in their cells 24 hours a day, only being taken out for 15 minutes every three (3) days for showering. Officers served prisoners meals in their cells which consisted of cereal in the mornings and then either a bologna or peanut butter sandwich for both lunch and dinner. Coupled with Leo's insomnia and related anxiety, these harsh conditions during the extended lockdown were simply excruciating for him. The lockdowns have been recurrent and persistent both before and after the longer one described above (which lasted more than three months). While COVID outbreaks account for some of the lockdowns in recent months, more frequently they come as a result of "staffing deficiencies" or are security-related due to incidents of violence. In sum total, Leo's experience in detention has brought home the reality of the consequences to his misdeeds. Despite all the many challenges and difficult conditions, he has endured as a result of being detained for the first time in his life, Leo finds that he has grown as a human being through this experience. He has opened himself up once again to the idea of pursuing further education[17] as he is but 41 years of age and still a young man with a bright future laying ahead of him. He is most centrally focused, upon his release, in returning to his mother and other family members and laying the necessary foundation to be able to once again be there for

_____

[17] See, PSR at ¶6 indicating Leo's voluntary participation in a journaling program which he notes having found enlightening and therapeutic.

them and support them in all the ways they need[18]. He is determined to rebuild his life and redefine his character once he has completed serving his punishment for the serious mistakes he fully owns and accepts responsibility for.

*18 U.S.C. § 3553(a)(2)(A) – the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

There can be no confusion that Leo Hernandez fully recognizes the grave seriousness of the offenses he has committed and for which he now stands before this Court to receive judgment. Just as he understands the significance of his transgressions, he also appreciates the Court's duty to mete out just punishment to him in the interest of the public good in order to promote respect for the law. Moreover, he has come realize that it is also in his own best interest that this Court provide to him the individualized and fair punishment for his wrongful actions. A man raised in a home and indeed a family where respect for both the law of man and God were respected above all else, Mr. Hernandez thoroughly understands the importance of consequences and punishment in the shaping of good habits, correction of improper behavior and in molding and shaping an individual who can exhibit them. In a very real sense Mr. Hernandez fully appreciates and has come to internalize the understanding that the punishment he suffered during his incarceration was deserved.

*18 U.S.C. § 3553(a)(2)(B) – The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Activity*

Beyond the need for the imposed sentence to deter Mr. Hernandez from reoffending[19], a sentence commensurate with the defense's recommendation reflects the seriousness of the offense

---

[18] Leo's mother, Nilda is elderly and currently struggling with various of her own health issues while relying upon social security and her eldest son's help to get by. Exh. A, *Affidavit of Nilda Hernandez*, See also, PSR at 40.
[19] This concept of "specific deterrence" to Mr. Hernandez from reoffending is addressed *infra*, in the discussion of 18 U.S.C. § 3553 (a)(2)(B).

and exhibits to the community that dealing in this type of criminal behavior will be punished by a substantial period of incarceration. In fixing a carefully considered and individualized sentence for Mr. Hernandez based upon his unique history and circumstances, as well as his proportionate role within the greater conspiracy and compared to his coconspirators, the Court demonstrates its unique ability to fix the correct and just punishment for each individual that comes before it. In a society where the populous sees that justice for each individual defendant is in fact flowing from the Court, a respect for the law and for law-abiding behavior grows the strongest and the most quickly.

*18 U.S.C. § 3553(a)(2)(C) – The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant*

As all parties agree, Mr. Hernandez' Criminal History Category is I, with his only other (state) criminal matter occurring 20 years ago when the defendant was just 20 years of age. That case resulted in a probationary sentence along with a sustained drug treatment program which was completed without incident. See generally, *Plea Agreement; PSR at ¶34*. Setting aside that remote and isolated case, there is simply no evidence of any other criminal offending by Mr. Hernandez other than his activities related to the instant matter. Leo is someone, as described, *supra*, and in the supporting evidence appended hereto, whose early adulthood, for well over a decade, was wholly crime free. Even while he later engaged in his unlawful activities related to this case, Leo remained employed full-time as a cement truck driver and, later, when he curtailed his involvement in the instant conspiracy and began his life anew in Colombia in 2018, he began that life by launching a fully above-board and legal enterprise.  See, Exh. C, *National Police Certificate*. The criminal offending Leo was involved with in this case was always incidental, never the central feature of his life and, going forward, criminal offending never will be any part of his life in any way shape or form. Leo has determined- after his grueling, often times terrifying, and thoroughly

16

life-changing experience of being detained at MDC Brooklyn - to make the remainder of his life a mirror of his many years as the hard-working, god-fearing person his family loved and depended on. The days of giving in to temptation and the addiction-fueled thinking that drove his continued offending for the sustained period of time in the indictment are gone forever.

Mr. Hernandez has demonstrated that he is certainly not someone is likely to commit crimes of any type. Moreover, he is someone who is a source of strength, support, and even inspiration to his loved ones and his peers throughout his life, including during his post-offending years trying to make his business successful in Colombia. See, Exh. A, *Statements of Family Members, Former Employers, Business Associates, and Friends*. Those who have known him for decades are able to speak of Mr. Hernandez' seriousness, honesty, loyalty, and strong character going all the way back to his youth. *Id*. Those who came to know Leo in recent years in Colombia have even stronger positive sentiments to share about the Leo they came know, respect and depend on. See, Exh. C, *Statements of Nick McGirr and Omar Lujan.*

Mr. Hernandez' lack of any substantial criminal history and strong, positive contributions to his community and family, his drive to succeed in business through legitimate enterprising, all indicate an extremely low likelihood of further crimes of any kind. Moreover, Mr. Hernandez' response to being incarcerated for the first time in his life has revealed the type of character he has and the type of work ethic he possesses which indicate a near zero  likelihood of ever being involved in criminal activity again.

*18 U.S.C. § 3553(a)(2)(D) – the need for the sentence imposed to provide the defendant with needed educational of vocational training, medical care, or other correctional treatment in the most effective manner*

As an intelligent and well-spoken man with a strong employment and entrepreneurial history, Mr. Hernandez would respectfully submit that he is ready to reenter his community, the life of his family members and the work force. Leo has proven he is the type of offender who has learned before and certainly during his incarceration of how to lead a law abiding life. The lessons were learned, the time inside was not wasted.  He has used the last 18 months as time to reflect, work and educate himself in variety of ways, all in preparation for being the most productive Leo Hernandez he can be once released.   Mr. Hernandez has come to regard his time incarcerated, as he had to in order to be successful in completing it, as an opportunity to turn his punishment into a period of self-improvement in every possible way.

*18 U.S.C. § 3553(a)(3) – The Kinds of Sentences Available*

The Court has before it a range of sentencing options. The stipulated[20] Guidelines range (30-37 months) goes far beyond what is sufficient and necessary in this case. The Court has the discretion to sentence Mr. Hernandez to a time served or probationary sentence, as appropriate, in consideration of the totality of the circumstances.

*18 U.S.C. § 3553(a)(4) – The Guidelines and Guideline Range*

The offenses to which Mr. Hernandez has pled guilty and now stands for sentencing are those to which no mandatory minimum sentences are assigned by statute and the maximum term is 20 years. See, 21 U.S.C. § 841(b)(1)(C). Based on the share of the total drug weight assigned to Mr. Hernandez' conduct and for which he has accepted responsibility in pleading guilty and has

---

[20] See, Plea Agreement; see also, PSR at ¶60.

received a 3-point total deduction, his offense level (19) computes to 30-37 months. See generally, PSR ¶¶

*18 U.S.C. § 3553(a)(5) – Any Pertinent Policy Statement issued by the Sentencing Commission*

There is no applicable policy statement of the Sentencing Commission that is applicable to Mr. Hernandez' conviction or case.

*18 U.S.C. § 3553(a)(6) - The Need to Avoid Unwarranted Disparities in Sentencing of Similarly Situated Defendants Convicted of Similar Conduct*

Several of Mr. Hernandez' co-conspirators and codefendanst have been sentenced for their respective roles in furtherance of this conspiracy. In considering the need for consistency and proportionality, running alongside the need for individualized sentencing, all parties would agree that a thorough review of the criminal offending conduct, commensurate guidelines' ranges, recommendations and ultimate punishment those individuals received, is a critically important factor in the Court's sentence for Mr. Hernandez.

The principal actor, the head of conspiracy, Joseph Olivieri, who wrote out of all of the fraudulent prescriptions- making him one of the top-15 opioid prescribers in New York State during the years of the conspiracy- and who deposited in his own bank account in excess of one million dollars in cash in ill-gotten gains, received a sentence of 40 months incarceration despite a guidelines range recommendation of 87-108 months. See, *18-CR-316 (PAC). Judgement, ECF No. 126; see also, Gov't Sentencing Memorandum, ECF 102.*  It is clear that Dr. Oliveri was vastly more culpable and responsible for total the quantum of opioids distributed during the period of the conspiracy (50%) than was Leo Hernandez. According to the government's calculations, Leo is responsible for only 2% of the drug weight in the overall conspiracy. That makes Oliveri twenty

five times more culpable than Hernandez.  Additionally, without Dr. Oliveri the conspiracy never materializes. Without Leo Hernandez, the conspiracy still happens and flourishes.  Leo Hernandez needs Dr. Oliveri to participate in the conspiracy, Dr. Oliveri can find dozens of Leo Hernandez'.

Another major player in the conspiracy who has been sentenced is Matthew Brady. Mr. Brady, who pled guilty to the same offense as Leo, was responsible for a vastly greater proportion of the total quantum of drugs Mr. Olivieri fraudulently prescribed than Leo was. Mr. Brady, who faced a stipulated guidelines range of 51-63 months in prison due to that greater weight[21], however, received a sentence of incarceration of just 36 months. *18-CR-316 (PAC) Judgment, ECF No. 90* Notably, Mr. Brady was then released from incarceration after serving only sixteen (16) months when his motion for compassionate release was ultimately granted. See, *18-CR-316 (PAC) Order, ECF No. 101. Leo has already spent a greater amount of time incarcerated as a result of his offending conduct than Mr. Brady has (or ever will) be required to serve in prison, despite Brady's exponentially more damaging cumulative drug activities in this conspiracy*. While Brady, like Leo and others in the conspiracy, may have had struggles with addiction to the very opioids he was heavily involved in distributing, as well as his own personal health issues[22], he was not the elderly, enfeebled defendant Olivieri perhaps presented at the time of his sentencing. Moreover, Mr. Brady, like virtually all others in this conspiracy, and unlike Leo Hernandez, was at liberty throughout the pendency of his prosecution and was thus able to assist in his own defense and sentencing submission in a way Leo simply cannot as an incarcerated defendant.

Finally, there is Leo's other codefendant, Anastasios Verteouris, whose culpability the government considers similar to that of Mr. Hernandez.  Verteouris, who like Brady and Olivieri,

---

[21] See, *18-CR-316 (PAC) Gov't Sentencing Submission, ECF No. 84*

[22] As noted throughout this memorandum and reflected in the supporting medical records (Exh. E), Mr. Hernandez also suffers from a variety of conditions and physical and mental health ailments, including: asthma, high cholesterol, anxiety, ADHD, sleep apnea and others.

(and unlike Leo) was granted pre-trial release on bail immediately after his arrest and remained at liberty throughout the pendency of his case.  Mr. Verteouris, who spent but a day or possibly two in detention prior to his post-arrest release, was sentenced by this Court, just last month (on August 9, 2022) to time-served. Importantly, both Verteouris and Leo were found to be responsible for an equivalent amount of the total drug weight (2%) in the conspiracy and Verteouris faced the same exact guideline level calculation and sentencing recommendation (30-37 months incarceration[23]). While the Court no doubt carefully considered the full gamut of sentencing considerations and options available in fixing the punishment for Mr. Verteouris, the sentence Mr. Hernandez receives should be the similar, if not the same, when considering the application of 18 U.S.C. § 3553(a)(6) to Leo's sentencing determination, given their equivalent criminal responsibility and culpability.

*18 U.S.C. § 3553(a)(7) – The Need to Provide Restitution to Victims*

As there is no identifiable victim in this offense[24] restitution is not applicable pursuant to 18 U.S.C. § 3663. *PSR ¶70-71.*

*Conclusion - Sentencing Recommendation*

After considering the sentences meted out to the other, vastly greater or equally culpable defendants in this conspiracy, *supra*, as well as Mr. Hernandez' offending conduct, background, personal circumstances, medical and mental health conditions, including his addiction during his period of offending, as well as his thoroughly positive responses to his time in detention, counsel

---

[23] The government in that case recommended a sentence at the "bottom" of the Guidelines range. See, *20-CR-79 (RMB), ECF No. 84*

[24] *PSR ¶¶19, 25.*

respectfully submits that a sentence of time-served, or in the alternative a sentence of 18 months incarceration, followed by an appropriate period of supervised release, is sufficient but not greater than necessary to meet the goals of sentencing.  In the defense's view this recommendation is in keeping with "even-handed" spirit of the "parsimony provision" of 18 U.S.C. § 3553(a) in accounting for the need to not sentence Leo to a disproportionately greater period of incarceration than those equally or more culpable than he in the exact same criminal enterprise.

Sincerely yours,


___//s// David J Cohen
David J. Cohen
Cohen Forman Barone, LLP.
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com

22